

1  **PLATTNER VERDERAME PC**
2  316 E. Flower St.
   Phoenix, Arizona 85012
3  Telephone: (602) 266-2002
   Frank Verderame
4  Arizona State Bar No. 007519
5  fverderame@pvazlaw.com
   Nicholas A. Verderame
6  Arizona State Bar No. 030683
7  nverderame@pvazlaw.com

8  *Attorneys for Plaintiffs/Relators*

9

10              **IN THE UNITED STATES DISTRICT COURT**

11                **FOR THE DISTRICT OF ARIZONA**

12  UNITED STATES OF AMERICA, *ex rel.*          **FILED UNDER SEAL**
13  ERIC JAMES STENSON,
                                             Case No.  CV-19-306-TUC-EJM
14                        Plaintiff/Relator,
                                             **COMPLAINT FOR VIOLATIONS OF**
15  v.                                       **THE FALSE CLAIMS ACT, 31 U.S.C.**
16                                           **§§ 3729, *et seq.***
    RADIOLOGY LTD., P.L.C.,
17
18                        Defendant.          **JURY TRIAL DEMANDED**

19

20       COMES NOW the Plaintiff above named, by and through his attorneys undersigned,

21  and for his cause of action against Defendant, states and alleges as follows:

22                            **INTRODUCTION**

23       1.    *Qui Tam* Plaintiff ERIC JAMES STENSON ("Plaintiff"), by his attorneys,

24
25  individually and on behalf of the United States of America, files this Complaint against

26  Defendant RADIOLOGY LTD., P.L.C, ("Defendant") to recover damages, penalties, and

attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, ("FCA").

2.     This case concerns the unlawful use of non-diagnostic computer monitors – the Dell 30" UP3017 and 23" e2318h (the "Dell Non-Diagnostic Monitors") – for radiology image interpretation, as well as other uses in the treatment and diagnosis of disease. Defendant uses these non-diagnostic computer monitors to interpret imagines for an official billable report that is used to make healthcare decisions. Such non-diagnostic computer monitors do not have FDA approval, do not have Premarket Approval Application ("PMA"), and do not have a 510(k) exemption, and as such, Defendant's use of the monitors is in direct violation of the Food, Drug, and Cosmetic Act (21 U.S.C., Ch. 9 § 301 *et seq*) (the "FDCA").

<u>**JURISDICTION AND VENUE**</u>

3.     This Court has subject matter jurisdiction over this action under FCA, as it is an action arising under the laws of the United States of America, specifically 31 U.S.C. § 3730(b).

4.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), as Defendant transacts business in this judicial district.

5.     Venue is proper in this Court under 28 U.S.C. § 1391(c) and § 1395(a), as the complained of illegal acts occurred within this judicial district, and because Defendant transacts business within this judicial district.

. . .

2

6.   Plaintiff served a copy of the original complaint filed in this action, along with a written disclosure of substantially all material evidence upon the government, as is required by 31 U.S.C. § 3730(b)(2).

**PARTIES**

7.   Plaintiff is an information-technology executive in the health care industry, and was the Director of Information Technology for Intermountain Medical Imaging, LLC ("IMI"), Gem State Radiology, LLP and Advanced Vein Therapy ("AVT"). IMI, Plaintiff's employer of record for W-2 purposes, is a joint venture of Gem State Radiology, LLP ("GSR") and Saint Alphonsus Health System, a large multi-hospital regional health system that is part of Trinity Health ("Trinity Health"). Trinity Health is of the largest health care systems in the United States of America. No wrongful conduct or other claims are alleged as part of this Complaint against any of IMI, GSR, AVT or Trinity Health.

8.   During, and in the course of, Plaintiff's employment, he has learned and personally observed Defendant's radiology reading practices. *See* Exhibits 1-4, attached.

9.   Defendant Radiology Ltd., P.LC. is an Arizona Corporation, with its business address listed as 677 N. Wilmot Rd., Tucson, AZ, 85711.

10.   The Centers for Medicare and Medicaid Services ("CMS") is the organization that administers and manages Medicare.  Noridian Health Services is the CMS contractor for the State of Arizona.

. . .

3

## MEDICARE OVERVIEW

11.　　In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. § 1395, *et seq.* ("The Medicare Program" or "Medicare"), authorizing the federal government to pay for the cost of certain medical services for persons aged 65 and older.

12.　　The United States of America, through the Department of Health and Human Services ("HHS"), administers the Medicare program.　Part A of the Medicare program covers inpatient hospital stays as well as other treatment unrelated to this Complaint. Part B of the Medicare program is a federally subsidized health insurance system for disabled persons, blind persons, or persons who are 65 or older.

13.　　Eligible persons aged 65 and older may enroll in Part B of the Medicare program to obtain benefits in return for payments of monthly premiums as established by HHS.　Part B covers, in general, 80% of reasonably charged services and items other than hospital expenses, and 100% of clinical diagnostic services.

14.　　HHS has delegated the administration of the Medicare Part B Program to its component agency, the Centers for Medicare & Medicaid Services ("CMS") CMS is a part of the Department of Health and Human Services.

15.　　Medicare reimbursement to providers of medical services is accomplished through private insurance carriers ("carriers"), as provided by 42 U.S.C. § 1395u.　The carrier, on behalf of the Medicare program, reviews and approves claims submitted for reimbursements by Medicare providers.

. . .

4

16.     On information and belief, at all relevant times hereto, Defendant signed or caused to be executed provider agreements with Medicare that permitted Defendant to submit claims and accept payment for services provided by Defendant.

17.     As a condition of participation in the Medicare program, providers agree to be familiar with, and abide by, the program's reimbursement policies.   In particular, when Defendant's physicians submitted their Medicare Enrollment Applications, they certified to the following requirements:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.   The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

> I agree that any existing or future overpayment made to the supplier by the Medicare program may be recouped by Medicare through the withholding of future payments.

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

(*See* CMS Form 855-B, Medicare Enrollment Application.)

18.     Accordingly, Defendant has a duty to be knowledgeable of the statutes, regulations, and guidelines regarding coverage for Medicare services.

. . .

5

19.    Absent certain exceptions that are inapplicable here, Medicare does not cover, and providers agree not to submit claims for, services provided that are not necessary, not appropriately administered, or not properly documented.

20.    In short, in order for Defendant to be properly reimbursed by the Medicare program, CMS requires that the physicians properly administer the services, or more specifically, read radiology images on medically appropriate displays, and appropriately document the justification and administration of those services.

21.    The carrier makes payment on those claims which appear to be eligible for reimbursement under Medicare Part B on behalf of the United States of America.  42 U.S.C. § 1395u(a).

22.    Claims may be made by the beneficiaries or by providers who have received assignment from beneficiaries to make claims on their behalf.  *See* 42 U.S.C. §§ 1395u(b)(3)(B).  HHS has issued the HCFA Carriers Manual, which is a guideline and explanation of the Medicare statute and its regulations.

23.    Before accepting Medicare assignments, Defendant, and all providers who submit claims for services provided to Medicare beneficiaries, must certify that it will operate in accordance with the requirements established by the Secretary of the Department of Health and Human Services.

24.    In addition, requests for Medicare reimbursement are submitted on Health Insurance Claim Form CMS-1500.  The CMS-1500 form includes a box for the "SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR

6

CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)"

25.    Among the statements on the reverse of the CMS-1500 form is the following:

**SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)**

In submitting this claim for payment from federal funds, I certify that:  1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complied with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment . . . .

NOTICE:    Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

26.    When submitting a claim using the CMS-1500 form, the provider/supplier also certifies that (i) the information on the form is "true, accurate and complete"; (ii) payment of the claim will be from federal funds; and (iii) "any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal . . . laws."

27.    Completed CMS-1500 forms are submitted electronically to a Medicare Contractor that then reviews the claims for blatant errors, such as missing fields and/or information, and HIPPA violations.  If a request is accepted, the requesting company receives electronic notification.

28.     Although the Medicare Contractor is checking for errors, the certifying physician or supplier is ultimately responsible for the accuracy of the information upon which the claim is based.

29.     As such, each time a CMS-1500 is approved for non-conforming or undocumented services or services never rendered, the requestor receives payment for a false claim.

30.     The United States of America imposes a number of limitations on reimbursement that are relevant to this case.  First, Medicare only pays for services that are medically "reasonable and necessary."  In other words, Medicare requires, as a condition of coverage, that services be "reasonable and necessary for the diagnosis or treatment of illness or injury."  *See* 42 U.S.C. § 1395y(A)(l)(a). Second, it is specifically improper for a physician or supplier to willfully submit improper bills to Medicare for radiology services. *See* 42 U.S.C. § 1395m(b)(5)(C).

31.     Federal law prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a federal healthcare program." *See* 42 U.S.C. § 1320a-7(B)(a)(l).

32.     Similarly, federal law requires providers who discover material omissions or errors in claims submitted to Medicare, Medicaid or other federal health care programs to disclose those omissions or errors to the government. *See* 42 U.S.C. § 1320a-7(B)(a)(3)  *See also* Section 1128J(d) of the Social Security Act.

. . .

8

33.     At all times herein mentioned, Defendant had knowledge of, or recklessly disregarded, or were deliberately ignorant, of their legal obligation to have knowledge of the public policies expressed in the laws and regulations herein mentioned and of the fact that they must comply with all applicable Federal laws in order for the services performed to be approved for coverage under Medicare.

34.     CMS is the organization that administers and manages Medicare.

## FEDERAL FOOD, DRUG, AND COSMETIC ACT

35.     Primary diagnostic displays for use in radiology image interpretation are considered by the FDA to be Class II medical devices. *See* 21 CFR § 892.2050. Class II medical devices are defined by the FDA as medical devices that have a moderate to high risk to the patient and/or user. *See* Information Sheet Guidance For IRBs, Clinical Investigators, and Sponsors - Frequently Asked Questions About Medical Devices, dated January 2006, attached hereto as Exhibit 1.

36.     A Class III device is one "for which insufficient information exists to determine that general or special controls are sufficient to provide a reasonable assurance of safety and effectiveness." *Id*. Once a Class III device is acknowledged by the FDA to only present a moderate to high risk, it can be reclassified as a Class II device.

37.     In order for CMS to pay providers for claims based on the usage of a Class III device, that device must obtain a PMA or be exempted from the PMA process, commonly known as a "510(k)" by the FDA.

. . .

38.     A 510(k) is a premarket submission made to FDA to demonstrate that the device is substantially equivalent to a legally marketed device (21 CFR § 807.92(a)(3)) that is not subject to PMA.

39.     A Class III device that fails to meet PMA requirements or lacks a 510(k) clearance is considered to be "adulterated" under 21 U.S.C. § 351. The FDCA prohibits the "introduction or delivery for introduction into interstate commerce . . . any device . . . this is adulterated . . . ." 21 U.S.C. § 331(a). Generally, Class II devices are exempt from this rule.

40.     CMS, and other Government Health Providers, require that medical diagnostic displays be used by Defendant. This requirement exists because of the need for precision with respect to diagnosis and treatment of patients. *See* Requirements for Medical Imaging Monitors, attached hereto as Exhibit 2.

## I.     THE DELL NON-DIAGNOSTIC MONITORS REQUIRE EITHER PMA CLEARANCE OR A 510(K) EXEMPTION.

41.     However, Dell Non-Diagnostic Monitors, when used for diagnostic interpretation, are Class II devices **without** this exemption - the PMA and 510(k) requirements still apply to it – because it uses a fundamentally different (and lower standard) scientific technology than other picture archiving and communication system ("PACS"). *See* 21 CFR § 892.9(b) (stating that if the modified device operates using a different fundamental scientific technology, it is not exempt).

42.     Additionally, on information and belief, there are no other similar devices to the Dell Non-Diagnostic Monitors that are legally marketed for use as radiology PACS.

10

43.     Therefore, the Dell Non-Diagnostic Monitors are considered Class III, and without meeting the PMA requirements or obtaining a 510(k) clearance, are considered adulterated and its use is prohibited by the FDCA's 21 U.S.C. § 331(a).

44.     Thus, the manufacturer of the device must submit to the FDA either a PMA or file for a 510(k) exemption with the FDA. *Id.*

45.     Whether a device is FDA-approved is a key factor in whether its use is reimbursed under Government Health Care Programs. An essential element of a diagnostic radiology report is that the images are read by a licensed physician using a medical device that has not been adulterated within the meaning of the FDCA and, further, that such device is approved for use on human subjects. These elements are required for the compensability of services related to the report by Government Health Care Programs. *See* 42 CFR § 405.201(a), *see also* 42 U.S.C. § 1395y(m)(2)(A).

## II.     THE DELL NON-DIAGNOSTIC MONITORS ARE ARGUABLY NOT MEDICAL DEVICES AT ALL.

46.     On information and belief, Dell has not introduced the Dell Non-Diagnostic Monitors into interstate commerce for human use.

47.     A medical device is "any instrument, apparatus, implement, machine, appliance, implant, reagent for in vitro use, software, material or other similar or related article, intended by the manufacturer to be used, alone or in combination, for human beings ..." *See* World Health Organization definition of Medical Devices:

https://www.who.int/medical_devices/full_deffinition/en/

11

48.     Section 201(h) of the Federal Food, Drug, and Cosmetic Act defines a medical device as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals." *See* 21 U.S.C. 321(h)(2). https://www.fda.gov/training-and-continuing-education/cdrh-learn/overview-regulatory-requirements-medical-devices-transcript

49.     Thus, the Dell Non-Diagnostic Monitors are arguably not medical devices at all, and under no circumstances should be used for human diagnostic readings, and if used, such treatment would not be reimbursed by the United States of America.

50.     In fact, Dell partners with Barco Healthcare to manufacture any PACS workstations. *See* https://www.dell.com/learn/us/en/15/solutions/by-partner-barco

51.     Further, Plaintiff was personally told by a representative of the Dell/Barco partnership that Dell does not endorse the Dell Non-Diagnostic Monitors for medical use.

52.     As such, and because the Dell Non-Diagnostic Monitors use a different technology entirely than approved radiology interpreting displays, Defendant's use of the Dell Non-Diagnostic Monitors for diagnostic reports were not actually providing the services at all, and their claims to CMS for payment were generally fraudulent and in violation of 42 U.S.C. § 1395y(a)(1)(A) as no medical services were provided.

53.     Claims submitted for payment by Medicare that related to a violation of the FDCA are false claims under the FCA.

## DEFENDANT'S FRAUDULENT ACTIVITIES

I.   BILLING FOR UNAPPROVED USE OF NON-DIAGNOSTIC DISPLAYS.

54.   Defendant is a radiologist facility in Tucson, Arizona. It is comprised of more than 45 specialists, employs over 400 staff members, provides constant coverage for two hospitals, and has eight diagnostic centers. (https://radltd.com/about/who-we-are/)

55.   On information and belief, in 2016 alone, when excluding mammography's (for which Defendant uses 5k monitors), CMS paid $6,646,850.54 for diagnostic readings. *See* spreadsheet of 2016 Claims Data Rad Ltd., attached hereto as Exhibit 3.

56.   On information and belief, since July 1, 2013, Defendant utilized the Dell Non-Diagnostic Monitors to read diagnostic radiology images for human subjects.  The Dell Non-Diagnostic Monitors are not cleared by the FDA for such a use. A diagnostic-grade 30" 6MP monitor made and sold by Dell/Barco for use in diagnostic radiology has market price of $8,999. The Dell UP3017 has a retail price of $981. The Dell 23" e2318h has a retail price of $139.99. Using the non-diagnostic monitors has allowed Defendant to read radiology reports at a fraction of the equipment cost.

57.   Medicare determined and bases payment on a PACS workstation cost of $14,616.93 (ED053).

58.   The video display on a diagnostic radiology reading station is a Class II medical device. According to the FDA, "Class II devices are those for which general controls alone are insufficient to provide a reasonable assurance of safety and effectiveness.  In addition to complying with general controls, Class II devices are also subject to special controls identified

13

by the agency, which may include special labeling requirements, performance standards and post market surveillance."

(https://www.fda.gov/downloads/regulatoryinformation/guidances/ucm127067.pdf)

59.     The FDA requires a "510(k)" submission or Pre-Market Approval (PMA) for diagnostic radiology monitors to ensure patient safety. This includes Physical Laboratory Tests in the areas of (a) spatial resolution; (b) pixel defects (maximum counts, allowed defect types and locations); (c) artifacts; (d) temporal response; (e) luminance (max, min, achievable, recommended); (f) conformance to grayscale-to-luminance function and DICOM GSDF); (g) luminance at 30-degree and 45-degree diagonals, horizontal, and vertical directions, center and four corners; (h) Mura test; (i) Stability of luminance and chromaticity response; (j) spatial noise; (k) reflection coefficient; (l) veiling glare and small-spot contrast; (m) color tracking, primary colors and gamut; (n) gray tracking, gray shades and white point). When the manufacturer submits a 510(k) for diagnostic radiology displays, it must also include proposed labels, labeling, and advertisements in sufficient detail to satisfy the requirements of 21 CFR 807.87(e), along with firmware and software documentation and electrical safety.

60.     The Dell Non-Diagnostic Monitors have neither had a PMA filed nor received a 510(k). While it the DellUP3017 *when used in* concert with the software, PerfectLum, has received 510(k) clearance, Defendant is using it without PerfectLum. *See* emails from Ron Cornett, Director of IT at Defendant, to Plaintiff, attached hereto as Exhibit 4. Thus, such use is specifically prohibited.

. . .

14

61.     Defendant's use of an adulterated PACS workstations and reading display setup has never been proven safe and effective through normal and customary means of clearing medical devices for use (the PMA process), and the use of non-diagnostic displays is plainly unlawful under the FDCA.

62.     Medical devices (such as radiology reading monitors) that do not have an FDA 510(k) clearance are considered by Medicare to be investigational or experimental in nature and are excluded from payment unless pre-approved by Medicare and used during FDA-approved clinical-trial. As a rule, the terms "unproven, experimental or investigational" are generically defined as the use of any device where effectiveness has not been demonstrated by required scientific evidence and properly authorized by governing entities in order to be acknowledged as medically effective for the improvement of function for specific conditions or treatment.

63.     Like Plaintiff, Defendant and its representatives attend and participate in industry-wide events and conferences, such as those put on by the Radiology Society of North America, where legally cleared display technologies are prominently marketed. Notwithstanding any specialized industry knowledge, as a general condition precedent to medical practice in the United States of America, it is common knowledge in the medical industry, as a condition to practicing medicine, that it is unlawful to use any device for diagnostic or treatment purposes that has not been cleared by the FDA.

64.     On information and belief, Defendant has an IT Department with a Director who has lead industry-wide technology initiatives.

15

65.     Defendant knew, deliberately ignored, or was recklessly disregarded the fact that normal and customary reading practices for image interpretation calls for the use of diagnostic-grade monitors that have been legally cleared by the FDA.

66.     Defendant's use of an adulterated PACS workstations and reading display setup has not only never been proven safe and effective through normal and customary means of clearing medical devices for use (the PMA process), the use of non-diagnostic displays is plainly unlawful under the FDCA.

67.     Thus, Defendant knowingly elected to use unauthorized medical devices (general purpose consumer monitors instead of diagnostic radiology monitors) in reading MRIs, CT scans, Ultrasounds, and general radiographs. A diagnostic conclusion and report cannot be legally made with an unapproved medical device and the use of the general-purpose consumer-grade monitor would be considered experimental or investigational in nature, and therefore the radiology professional read is excluded from payment by Medicare.

68.     Plaintiff has no knowledge as to how many patients' diagnoses were incorrect or incomplete as a result of Defendant using Dell Non-Diagnostic Monitors as opposed to FDA-approved diagnostic-grade monitors. However, there have been documented problems at the facility. *See* State of Arizona Medical Board Minute Entry regarding Advisory Letter to Dr. Vanasco, for failure to identify a 6mm calculus near ureteropelvic junction of the left kidney, Board Action MD-17-0957A, attached hereto as Exhibit 5.

69.     Defendant has submitted claims to CMS and Government Health Programs under the guise of having used FDA-approved display monitors. These actions have resulted in

false and fraudulent claims made to CMS and other Government Health Programs for the purposes of payment.

70.    By the nature of the CMS-1500's certifications, Defendant has certified that the diagnostic imaging is and has been conducted on FDA-approved monitors. However, this certification is fraudulent.

71.    CMS's payment schedule reflects the high cost of FDA-approved monitors, and thus, these false claims have allowed Defendant to minimize costs (at the expense of its patients) and maximize profits (at the expense of the United States' Government).

72.    Plaintiff learned of Defendant's fraudulent scheme to utilize non-diagnostic reading equipment for radiology reads through his employment at Intermountain Medical Imaging, which was having technology discussions with Defendant regarding mutual technology-related initiatives. Having personal knowledge that non-diagnostic monitors presented patient safety concerned based on a personal test experience[1], Plaintiff sought more information about the technology setup and legal compliance thereof from Defendant's Director of Information Technology.

73.    By virtue of his employment at a company that was informally collaborating with Defendant regarding overlapping technology initiatives, Plaintiff personally observed,

---

[1] On or about March 1, 2018, Plaintiff, in order to determine feasibility of high-end but non-diagnostic monitors, presented a non-diagnostic monitor setup to licensed radiologists (in a controlled test environment) to read a CT study with a known cancer diagnosis. During this test scenario, a physician-radiologist stated that he was unable to see a cancer mass on the non-diagnostic display. He showed Plaintiff certain image areas that could not be seen due to insufficient contrast ratio on the non-diagnostic monitor, where such image features (and cancers) were otherwise clearly visible on a diagnostic display. Because it was clear that non-diagnostic monitors present an unacceptable risk to patient safety, the health system did not proceed with using non-diagnostic monitors.

17

and also obtained emails and documents demonstrating Defendant's fraudulent conduct described here, but lacked access to documents that detail the specific false or fraudulent claims that Defendant submitted or caused to be submitted.

## II.   THE UNITED STATES OF AMERICA HAS BEEN DAMAGED BY DEFENDANT'S FRAUDULENT CONDUCT

74.   Defendant submitted claims to the United States of America for providing services to patients covered by Medicare, which the federal government reimburses.

75.   But for Defendant failing to inform the government that they are using unapproved display monitors that the CMS guidelines specifically say should not be paid for – and submitting claims for reimbursement for the use of those displays – CMS would not reimburse for these services.

76.   Defendant's fraudulent practices and violations have occurred since at least 2013, and are ongoing through present.   To Plaintiffs knowledge these fraudulent practices across all Defendant's providers and patients.

### COUNT I
**Defendant Knowingly Present, or Causes to be Presented**
**False or Fraudulent Claims, Statements, and Records**
**31 U.S.C. § 3729(a)(1)(A)**

77.   Plaintiff reasserts and incorporates by reference all paragraphs set forth above, as if fully restated herein.

78.   31 U.S.C. § 3729(a)(I)(A) subjects to liability any person or entity that "knowingly presents, uses, or causes to be presented, a false or fraudulent claim for payment or approval."

18

79.     It is neither medically reasonable nor medically necessary to perform diagnostic readings on monitors that are not developed, manufactured, marketed, or approved for diagnostic readings.

80.     Defendant knowingly presented, or caused to be presented, to the United States of America false or fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval under the federally-funded procurement contracts in violation of 31 U.S.C. § 3729(a)(l)(A).

81.     Defendant had actual knowledge, or were reckless in not knowing, or were deliberately ignorant to the truth that these claims were false and fraudulent.

82.     The United States of America, through CMS and/or other Government Health Care Programs, was unaware of the false or fraudulent nature of these claims, and

83.     For each claim submitted, Defendant certified that the service identified on the CMS-1500 were "personally furnished by [the provider] or were furnished incident to [the provider's] professional service by [the provider's] employee under the [provider's] personal supervision."

84.     As discussed above, Defendant's statements that certain services were furnished - whether personally by the certifying provider or by the certifying provider's employee – are false.

85.     Even though a Plaintiff is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Plaintiff . . .

need only allege sufficient indicia of reliability, Plaintiff in this case has, as set forth above, alleged the who, what where, when, and how of the fraud alleged in this Count.

86.     Materiality is not reasonably in dispute.  But-for Defendant's submission of false statements on the CMS-1500 and submission of claims under false pretenses, the United States of America would not have reimbursed Defendant for the claims.

87.     A physician's truthful certification is an express condition of payment and is material to the government's decision to pay.  This has to be true, because CMS will not pay a claim absent the physician's signature on the CMS-1500.

88.     The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

**COUNT II**
**Defendant Knowingly Presented, or Caused to be Presented**
**False Claims for Medically Unreasonable and Unnecessary Services**
**31 U.S.C. § 3729(a)(l)(A)**

89.     Plaintiff reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

90.     31 U.S.C. § 3729(a)(1)(A) subjects to liability any person or entity that "knowingly presents, uses, or causes to be presented, a false or fraudulent claim for payment or approval."

91.     Any time a provider – like Defendant – submits a claim for payment, they must certify on the CMS-1500 form that the services provided comply with all laws, rules, and

20

regulations concerning reimbursement from Medicare.  As is relevant to this count, Medicare will only pay for services that are "*reasonable and necessary* for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(A)(1)(a).

92.     It is neither medically reasonable nor medically necessary to perform diagnostic readings on monitors that are not developed, manufactured, marketed, or approved for diagnostic readings.

93.     Plaintiff has first-hand knowledge of services for which Defendant submitted claims for payment for services that were not medically reasonable or necessary in that the diagnostic services were not performed with adequate, and approved, medical devices.

94.     Defendant knowingly presented or caused to be presented to the United States of America, false or fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval under the federally-funded procurement contracts in violation of 31 U.S.C. § 3729(a)(1)(A). Defendant recklessly disregarded, or was deliberately ignorant, to the truth.

95.     Defendant submitted claims and received payment from the United States of America through CMS for services that were not medically reasonable yet were provided to Medicare beneficiaries.

96.     Materiality is not reasonably in dispute.  If Defendant had not submitted these false statements on the CMS-1500, the United States of America would not have reimbursed Defendant for the claims.  In other words, CMS would not have paid for these services if it knew that Defendant had not provided them.

97.     The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT III
**Defendant Knowingly Made, Used, or Caused to be Made or Used,**
**False Records or Statements Material to False Claims**
**31 U.S.C. § 3729(a)(l)(B)**

98.     Plaintiff reasserts and incorporates by reference all paragraphs set forth above as if restated-herein.

99.     The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(l)(B).

100.    As a result of Defendant's actions, the United States of America paid Defendant funds from the Medicare programs for medically unreasonable and unnecessary services.

101.    As a result of Defendant's actions, the United States of America paid Defendant funds from the Medicare programs because of false records.

102.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

103.    On information and belief, in order to submit claims for payment to the United States of America, Defendant submitted a statement that the radiology PACS were either FDA approved.

22

104.   Likewise, Defendant made false records material to false claims when they signed CMS-1500 forms indicating: (i) that services were performed when they were not and (ii) that the services were medically reasonable when they were not.

105.   These records are material to the false claims submitted by Defendant insofar as CMS, in order to determine whether or not to make payment, relies upon the certifications by Defendant that services were actually furnished and that those services were medically reasonable.

106.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

**COUNT IV**
**Defendant Knowingly Conspired to Act in a Manner**
**That Violated 31 U.S.C. § 3729(a)(1)(A) – (B)**
**31 U.S.C. § 3729(a)(1)(C)**

107.   Plaintiff reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

108.   The False Claims Act imposes liability on any person who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(l)(C).

109.   On information and belief, people in decision-making positions at Defendant, through their concerted actions, conspired to use Dell Non-Diagnostic Monitors and in violation of 31 U.S.C. § 3729(a)(l)(A) – (B).

. . .

23

110.   As a result of these actions, Defendant was able, and continues to be able, to defraud the United States of America.

111.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

**COUNT V**
**Defendant Knowingly Present, or Causes to be Presented**
**False or Fraudulent Claims, Statements, and Records for Services Not Provided**
**31 U.S.C. § 3729(a)(1)(A)**

112.   Plaintiff reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

113.   Dell partners with Barco Healthcare to manufacture any PACS workstations and Plaintiff was personally told by a representative of the Dell/Barco partnership that Dell does not endorse the Dell Non-Diagnostic Monitors for medical use.

114.   As the Dell Non-Diagnostic Monitors were not put into interstate commerce for human use, it was not a medical device.

115.   Thus, because Defendant used a monitor that was not approved by the United States Government as a medical device, the radiological readings were not medical services provided and should not have been submitted to CMS for payment.

116.   Thus, for each of the services described herein, Defendant submitted claims and received payment from the United States of America through CMS for services that were not provided to Medicare beneficiaries.

24

117.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

*See* the attached Appendix of Exhibits, containing written disclosure of substantially all material evidence and information possessed by the relator (in addition to information contained in this Complaint).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, acting on behalf of and in the name of the United States of America, and on their own behalf, pray that judgment be entered against Defendant for violation of the False Claims Act as follows:

a.   In favor of the United States of America against Defendant for treble damages to the federal Government from the submission of false claims pursuant to 31 U.S.C. § 3729(1) and (3), and the maximum civil penalties for each violation of the False Claims Acts;

b.   In favor of the Plaintiffs for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees, and costs incurred by the Plaintiffs;

c.   In favor of the Plaintiffs for all damages pursuant to 31 U.S.C. § 3730(h)(2) to include reasonable expenses, attorneys' fees, and costs incurred by the Plaintiffs;

d.   For all costs of the False Claims Act civil action; and

e.   In favor of the Plaintiffs and the United States of America for further relief as this Court deems just and equitable.

. . .

**DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, and pursuant to the local rules of this Court, Plaintiffs demand a jury trial as to all issues so triable.

RESPECTFULLY SUBMITTED this 6th day of June, 2019.

PLATTNER VERDERAME, P.C.

BY _____
FRANK VERDERAME
NICHOLAS A. VERDERAME
316 E. Flower St.
Phoenix, Arizona  85012
Attorneys for Plaintiffs/Relators

ORIGINAL of the foregoing filed with
the U.S. District Court, District of Arizona,
this 6th day of June, 2019.

Donna L. Goetzenberger, Paralegal to:
FRANK VERDERAME
NICHOLAS A. VERDERAME

## APPENDIX OF EXHIBITS

1.    Information Sheet Guidance for IRBs, Clinical Investigators, and Sponsors –
      Frequently Asked Questions About Medical Devices

2.    Requirements for Medical Imaging Monitors, by Ken Compton and Herman
      Oosterwijk

3.    Spreadsheet of 2016 Claims Data Rad Ltd.

4.    Emails confirming monitors used.

5.    State of Arizona advisory letter to Dr. Vanasco for failure to identify a 6mm calculus
      near ureteropelvic junction of the left kidney, Board Action MD-17-0957A